IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 20, 2021 Session

## JENNIFER KING v. DELFASCO, LLC, ET AL.

**Appeal from the Circuit Court for Greene County**
No. 14-CV-409      Beth Boniface, Judge

_____

### No. E2020-01038-COA-R3-CV
_____

This appeal concerns an alleged violation of Tenn. Code Ann. § 50-1-304, the Tennessee Public Protection Act ("TPPA"), as well as common law retaliatory discharge. Jennifer King ("King"), a former shipping and receiving coordinator for Delfasco, LLC, a company that manufactures defense-related products, sued Delfasco, LLC and related entity Delfasco Finance, LLC ("Delfasco" collectively) in the Circuit Court for Greene County ("the Trial Court") alleging she was wrongfully fired for refusing to share with Delfasco owner Jack Goldenberg ("Goldenberg") her government-issued password to the Department of Defense ("DOD") Wide Area Workflow ("WAWF") system. King had consulted a DOD representative who advised her not to reveal her password. After a trial, the Trial Court found in favor of King and awarded her damages. Delfasco appeals, arguing among other things that King was not asked to perform an illegal act. King raises her own issues concerning damages. We find, *inter alia*, that the evidence does not preponderate against the Trial Court's factual findings, and we leave undisturbed the Trial Court's credibility determinations. King acted under the reasonable belief that it was unlawful to share her password with Goldenberg. Further, the record reflects that King was fired solely because she refused to reveal her password to Goldenberg. We affirm the judgment of the Trial Court in its entirety, and remand for an award to King of her reasonable attorney's fees incurred on appeal.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON, II, J., joined.

Henry C. Shelton, III, Lucian T. Pera, and J. Bennett Fox, Jr., Memphis, Tennessee, for the appellants, Delfasco, LLC and Delfasco Finance, LLC.

Jimmie C. Miller and Joseph B. Harvey, Kingsport, Tennessee, for the appellee, Jennifer King.

## OPINION

## <u>Background</u>

King worked for Delfasco, LLC, and its predecessor Delfasco, Inc., from 1995 until her termination on October 23, 2013. In 2010, Goldenberg bought Delfasco and became King's new boss. Delfasco does much of its business with the DOD. King applied for payment on Delfasco's behalf by submitting electronic invoices via WAWF, a governmental system. As a prerequisite for using WAWF, King had to agree to the terms of the User Agreement. The User Agreement provided, as relevant:

> All Users shall: …
>
> Protect their password(s) and/or Common Access Card (CAC) personal identification number (PIN). Promptly change their password/PIN when possibly compromised, forgotten or when it appears in an audit document. Immediately notify their Terminal Area Security Officer (TASO) or their IAM [Information Assurance Manager] if they believe their password/PIN has been compromised and promptly change their password/PIN. (Your TASO or IAM will verify that your password changed and/or PIN has been reset.)
>
> ***
>
> I understand that I may be subject to civil, criminal or administrative action for failure to follow the DoD Standard User Agreement, and the System Security and Privacy Rules of Behavior (ROB/ Acceptable Use Policy (AUP) applicable to me.

At some point before October 15, 2013, King made certain typographical errors on invoices that resulted in Delfasco not getting paid promptly. Goldenberg, based in New York, emailed King to ask about the delay. King responded that she was working to resolve the issue. Part of their email exchange, which is contained in the record, went as follows:

> Oct 16, Goldenberg to King
> "If you knew this yesterday why do I have to find out today?
> I am very frustrated and upset that 160k is in limbo because of your "mistakes" and lack of communication"

Oct 16, King to Goldenberg
"All I can say is I am sorry and trying to fix it the quickest way possible"

This sort of back-and-forth drew on over a week's time. Eventually, Goldenberg demanded that King share her WAWF password with him. King refused. Goldenberg stated he would fire her if she did not comply. King stuck to her refusal, and Goldenberg fired her. The email exchange culminated as follows:

Oct 22, Goldenberg to King
"Send me the login info now!"

Oct 22, King to Goldenberg
"With all due respect I am not able to give you my login password[.] WAWF has informed me that you will have to set up an account under your name with your login information. Do you wish me to circumvent their direction to me? If so I will send it immediately. I am not trying to make this difficult I am only trying to abide by the rules of the government."

Oct 22, Goldenberg to King
"You have 2 options.
1 send me the info. Its my company and what ever access u have is with my consent.
2 file for unemployment tom.
Ur choice."

Oct 23, King to Goldenberg, copy Tammee Rohr
"Jack,
Last week when I corrected invoices I was instructed by DFAS to correct receiving reports manually and have Deanna to sign off on them then fax them to DFAS. Every time I have spoke to DFAS they have told me they had the faxed copies just having to match them to invoices. On Monday DFAS told me they were in payable status so I did not know there was anymore issues till you emailed me yesterday. I called DCMA yesterday to see if they could tell me what was going on…."

Oct 23, Goldenberg to King
"Why did you come in today?"

Oct 23, King to Goldenberg
"I reported today just like always this is my place to work"

Oct 23, Goldenberg to King
"So let me make it clear for you get out from my plant. Your last day was yesterday."

King's 18-year tenure at Delfasco thus came to an end. In September 2014, King sued Delfasco in the Trial Court alleging common law retaliatory discharge and violation of the TPPA. Delfasco filed an answer in opposition. Delfasco also filed two motions for summary judgment, which were denied. In March 2020, this case was tried without a jury. King requested, among other damages, emotional distress damages and punitive damages. Goldenberg did not testify at trial; King, among other witnesses, did.[1] We proceed to review the pertinent testimony.

King, age 56, testified she was fired for refusing to reveal her WAWF password to Goldenberg despite his insistence that she do so. King stated she refused because "[WAWF] said it was illegal to reveal our passwords." King testified to the nature of Delfasco's business and its hierarchy when she worked there. Delfasco is involved in metal fabricating, and has a facility in Greeneville, Tennessee. From 2001 or 2002, King's supervisor was Tammee Rohr ("Rohr"). Randy Shipley ("Shipley") was plant manager. Goldenberg was Delfasco's owner from 2010 onward. Goldenberg did not work on site but visited the facility from time to time. King testified that she held negative views of Goldenberg's management of Delfasco. King stated, for example, that Goldenberg once "put money into our personal accounts and pulled it out." King stated further that Goldenberg had gone "behind the government's back and brought in material that wasn't approved by the government." King also testified that Goldenberg brought in one Clyde Mullins as a consultant to assist in operations.

King then testified regarding WAWF, the governmental electronic system at the heart of the present dispute. King stated that DOD suppliers were required to use this system. Defense Logistics was the agency that administered WAWF. King testified to how WAWF worked:

Well, we had items to be shipped to the government. There was line items on the contract, and the quality inspector for the government would come and inspect our parts. And, once they approved it, I would submit the invoice by putting in the quantity, the amount, and the line item of the contract we were shipping against. And it would go up through the [WAWF] system. Once it was approved, it would send an email back saying that the invoice had been approved for payment.

---

[1] Goldenberg was deposed, but his deposition was not introduced at trial.

-4-

King stated that she needed a password to access WAWF. King testified to the application process she underwent to obtain her WAWF password:

> At the time when I did mine, there was paperwork that I had to fill out. At one time they even requested -- I had to prove why my name had changed. I had been married and divorced and remarried, and I had to show my marriage license and my divorce papers why my name had changed [sic].

King testified that the agreement she signed to obtain a password contained a "statement of accountability" stating in part: "I understand my obligation to protect my password certificate. I assume the responsibility for the data and system I am granted access to. I will not exceed my authorization access." Continuing her testimony, King stated that she loved her job at Delfasco and was good at it.

King then was asked about delays in the shipment of Delfasco products, particularly in regard to "first article testing." King described first article testing as follows:

> When we get a contract you have to have a submission of vendors. And the government comes in and you have that layout of the vendors. And, once the first article is completed, there's a vendor list and you can't go and get another vendor for that product; you have to stay with those vendors.

King stated that shipment of Delfasco products had been delayed in the past because of problems with first article testing. For instance, in March 2013, Delfasco's product was put on hold. In October 2013, the government finally agreed to release the product. However, there was a problem with the invoices. King made an error—specifically, a typo. King testified that Goldenberg was aware of this error as of October 15, 2013. Goldenberg went on to press King to give him her WAWF password.

King explained why she was hesitant to give Goldenberg her WAWF password upon his demand: "Because of the things he had done in the past with our paychecks, with the law; he had been arrested for fraudulent activity and I was afraid to give him my password." After Goldenberg made his demand, King called WAWF to ask whether it would be appropriate to share her password. According to King, she spoke to an administrator at WAWF. King testified to her conversation with this administrator as follows:

> I told him that the owner of the company, Mr. Goldenberg, was wanting my password and that he was threatening to terminate me if I did not give him my password. They told me that it was illegal, he could not terminate my position for -- revealing my password, that he had to create his own account

and get his own password.

As to her options at this point, King stated: "Well, it wasn't much of an option; I either had to commit a crime or lose my job. So I did not reveal my password to him." King testified that no one else at Delfasco had access to her WAWF password in October 2013.

Proceeding with our review of the testimony, King was asked to read an email Goldenberg sent to Rohr asking who else in the company might have a WAWF password. Rohr responded that no one else had a WAWF password that she was aware of, and that whenever King shared her password with Rohr when she was out of town, etc., King would change the password upon her return. King acknowledged that, on occasion, she had shared her password with Rohr. King also testified that she kept her password on a post-it note stuck on her computer monitor in her office which Rohr could see. King testified that she and Rohr were the only people who had keys to her office. King stated she never thought about whether sharing her password with Rohr might be illegal until Goldenberg asked for it. King, again citing her negative views about Goldenberg, explained: "Because of the things he had done in the past, he just wasn't trustworthy. And so that's why I called Wide Area Workflow, to confirm about revealing my password to him." King testified that after her conversations with WAWF, she never shared her WAWF password with anyone else again.

King testified she was "devastated" to lose her job of 18 years. King saw a doctor the day after she was fired. King was prescribed a "mild nerve medicine" to calm her down which she took for a "short time." King suffered from depression. With regard to her search for a new job, King stated that she was overqualified for many positions. In February 2015, King found a new permanent job. King began her new job as a shipping and receiving clerk. She later took a position as shipping coordinator. King stated that "[d]ue to this loss of my job, my husband and I have lost about everything. We have no savings. We can't recoup that." King stated of Goldenberg: "He gave me the choice of employment or committing a crime. So that's no choice."

The video deposition of Kym Witherspoon ("Witherspoon"), Information Systems Security Manager for the Defense Logistics Agency, was introduced. Counsel for Delfasco objected:

MR. HUTCHINSON: Your honor, I have a variety of ongoing objections to portions of this testimony.

***

-6-

But I guess one of my initial objections will be that Ms. Witherspoon testified -- and I believe you've heard this before -- that to have someone use someone else's password is unauthorized according to the terms of the user agreement. And we continue our objection that that should not be allowed because that is opinion testimony … And she's not qualified as an expert.

***

MR: RANGE: The other basis, Your Honor, for that particular objection, I think is that the document speaks for itself.

Over Delfasco's objections, the Trial Court admitted Witherspoon's deposition. As relevant, Witherspoon stated that disclosing one's WAWF log-in credentials to another person makes the disclosing party subject to criminal penalties. Witherspoon testified that King had been issued a personal and unique username and password for the WAWF system. Witherspoon testified further that Goldenberg was not authorized to access the password-protected areas of WAWF using King's log-in information. After Witherspoon's video deposition was played, portions of Clyde Mullins' deposition were read. Clyde Mullins had advised King that she should tell Goldenberg to get his own WAWF password.

Shipley, Delfasco's plant manager at the time of these events, testified. Shipley worked at Delfasco for 30 years before resigning voluntarily. Shipley testified it "would usually take almost a year to terminate anyone" at Delfasco and that progressive discipline typically would be implemented. Shipley testified he was unaware of any Delfasco employees having been terminated over typographical or paperwork errors. When Goldenberg demanded King's password, King went to see Shipley. Shipley testified to what he told King:

I told her that it looked like she had a decision to make, that she could either give it to Mr. Goldenberg or it looks like he was going to fire her. And I'll just tell you, when I seen that, I knew she was in between a rock and a hard place. She had to pick the less of the two evils.

Rohr, formerly King's supervisor, also testified. Rohr began working for Delfasco in 1989 and still worked there as of trial. Rohr stated she recalled no discussion about King having been fired for job performance reasons. Rather, King told Rohr she was fired for not providing her password. After King was fired, Rohr obtained her own WAWF password and username. Rohr testified she did not remember the last time King shared her password with her, but stated "[t]here was always a piece of paper on her desk -- or on her monitor with passwords." Rohr testified that, as for herself, she did not share her WAWF

password with anyone. Rohr stated that anyone who wishes to access WAWF must obtain her own password and username. Rohr testified that when King told her Goldenberg was demanding her password, Rohr's response was something along the lines of "it's your password, it's your call." Rohr testified that Goldenberg has since obtained his own WAWF password.

At this juncture, King returned to the stand. King stated she believed Goldenberg wanted her password so he could see the invoices at issue for himself. King testified that if Goldenberg had used her password to access WAWF, it would have shown as though King herself were using the system. Goldenberg then could then have looked at or changed invoices—provided they were not already approved—as though he were King.

Finally, Robert Baird McDonald, Jr. ("McDonald"), a forensic accountant and consultant, testified as an expert for Delfasco. In McDonald's view, WAWF safeguards would have made it highly unlikely that fraud could be committed on the system, which was a concern King testified to as a basis for her reluctance to give Goldenberg her password. McDonald testified at length to WAWF's security measures, concluding thusly:

> [A]gain, once that final 3-item verification takes place, payment's scheduled only then … [T]he visibility by the various stakeholders in terms of each -- each step of the way. And, so for these reasons, I think the system has transactional integrity. And that's why I think that fraud, if it were to be attempted by using the WAWF system, would be exceptionally difficult in every respect.

On cross-examination, McDonald stated, among other things, that government contracting is different from other industries; that accessing WAWF is not analogous to accessing, for example, Netflix, Yahoo, MySpace, or Facebook accounts; and that he was not offering the opinion that WAWF's instruction to King that she could not disclose her password was incorrect.

In March 2020, the Trial Court entered its memorandum opinion. The Trial Court found that King had proven her claims against Delfasco of common law retaliatory discharge and violation of the TPPA. However, the Trial Court ruled against King with respect to her requests for emotional distress damages and punitive damages. In its detailed memorandum opinion, the Trial Court found, in part:

> 1. Retaliatory Discharge, Tennessee Code Annotated § 50-1-304 and the common law
> King must show the following elements to be successful in her claim for retaliatory discharge under T.C.A. § 50-1-304:

1.    [That] King is an employee of the defendant employer;

2.    That she refused to participate in, or remain silent about, "illegal activities" as defined in the statute;

3.    That she was terminated from her employment; and

4.    That an exclusive causal relationship exists between her refusal to participate in/remain silent about illegal activities and her termination.

*Voss v. Shelter Mut. Ins. Co.*, 958 S.W.2d 342, 344 (Tenn. Ct. App. 1997).

The elements of common law retaliatory discharge are very similar:

1.    That she was an employee-at-will;

2.    That she was discharged;

3.    That the reason for the discharge was that she attempted to exercise a statutory or constitutional right. Or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and

4.    That the employee's action was a substantial factor in the employee's discharge.

*Crews v. Buckman Labs Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn. 2002).

All previous facts are incorporated herein. Under the Tennessee Public Protection Act, Tennessee Code Annotated § 50-1-304, elements 1 and 3 are uncontested. King was an employee of Delfasco whose employment was terminated on October 23, 2013. The first contested issue is whether King refused to participate in or remain silent about "illegal activities" as defined in the statute. King declined to provide her log-in information to Goldenberg because she reasonably believed that to do so would be unlawful. *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). King refused to violate the terms of the User Agreement and did not facilitate Goldenberg in accessing the password-protected areas of the DOD website, WAWF. Defendants argue that sharing her log-in credentials would be akin to someone accessing a Netflix account or MySpace account. This comparison is not credible. The process of applying for permission to access the governmental website is stringent. There is no meaningful vetting of a Netflix account user. Sharing movies is in no way comparable to accessing a secure DOD website. The DLA [Defense Logistics Agency] maintains many security checks to avoid fraudulent activity on its WAWF system. One of the security measures is the use of personal log-in information so that any activity may be tracked to the source. King sought advice from the DLA and was told not to share her password. The DLA sent King the User Agreement, which clearly stated that she was to protect her log-in information from

dissemination, and failure to do so could result in "civil, criminal or administrative action."

The evidence is clear and convincing that an exclusive causal relationship existed between King's refusal to provide her personal log-in information and her termination. Goldenberg did not appear at trial. The only credible evidence at trial was Goldenberg's emails showing that King was fired for not providing her password. There had never been any discipline of King, and her firing was contemporaneous to her refusal to deliver her log-in information. Her co-workers believe that her employment was terminated due to her decision to protect her log-in information. Defendants argue that King was fired for insubordination, but the only insubordination was her refusal to comply with Goldenberg's ultimatum.

The elements of common law retaliatory discharge are that King was an employee-at-will, who was discharged because she attempted to exercise a statutory or constitutional right or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and that her action was a substantial factor in the employee's discharge. It is uncontested that King's employment was terminated. King credibly states that her focal reason for not disclosing her personal information was that she consulted a DOD administrator who instructed her to withhold her log-in information. She points to her email wherein she denied access to her personal information and stated that she was "only trying to abide by the rules of the government." King did not know what specific law she would violate by allowing Goldenberg to access the DOD website with her log-in information, but she relied on the User Agreement, which mandates sharing her credentials could subject her to "civil, criminal or administrative action." King did not have an opportunity to consult with an attorney, Goldenberg issued an ultimatum, and she had to decide immediately. Upon her declination, Goldenberg fired her.

With regard to King's request for emotional distress damages, the Trial Court found as follows:

King lost medical insurance benefits totaling $5,096 and fringe benefits of $16,625. At trial, King testified that she was distraught over the loss of her job and cried non-stop for two days. She sought medical treatment on March 24, 2013 [sic], and took medicine for a short period of time. King did not require long-term treatment, and she only saw her treating physician once on March 24, 2013 [sic]. King's mental distress was appropriate due to her employment status, but her stress did not rise to the level or duration deserving of monetary damages.

-10-

With respect to King's request for punitive damages, the Trial Court found as follows:

> Delfasco's conduct harmed King, and she should be compensated for her loss, but Delfasco's actions were not egregious and do not justify the imposition of punitive damages. Delfasco was not condoning sexual abuse of a minor, as seen in *LaMore v. Check Advance of Tennessee, LCC*, No. E20090442COAR3CV, 2020 WL 323077 (Tenn. Ct. App. Jan. 28, 2010). There was no pattern of retaliation by Delfasco, as seen in *Coffey v. Fayette Tubular Products*, 929 S.W.2d 326 (Tenn. 1996). Delfasco improperly fired King and she deserves compensation, but the conduct does not warrant punitive damages.

The Trial Court awarded King damages for backpay, frontpay, lost benefits, prejudgment interest, attorney's fees, and costs. An additional hearing was later held regarding King's motion for attorney's fees. In July 2020, the Trial Court entered its final order regarding damages and fees. Delfasco timely appealed to this Court.

## Discussion

We restate and consolidate the issues raised by Delfasco on appeal as follows: 1) whether the Trial Court erred in concluding that King had a reasonable belief that sharing her password with Goldenberg was unlawful; 2) whether the Trial Court erred in concluding that King's refusal to share her password was the sole basis for her termination; 3) whether the Trial Court erred in admitting DOD employee Witherspoon's deposition testimony; and 4) whether the Trial Court erred in awarding King attorney's fees under the TPPA. Although not stated exactly as such, King raises the following separate issues: 1) whether the Trial Court erred in declining to award King any damages for emotional distress; 2) whether the Trial Court erred in declining to award King punitive damages; and 3) whether King is entitled to an award of attorney's fees incurred on appeal.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Regarding witness credibility, our Supreme Court has stated:

When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, —— U.S. ——, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

We first address whether the Trial Court erred in concluding that King had a reasonable belief that sharing her password with Goldenberg was unlawful. This Court has outlined the elements for claims of retaliatory discharge under the TPPA and at common law as follows:

Under the TPPA, "[n]o employee shall be discharged or terminated *solely* for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b) (2014) (emphasis added). To state a claim for relief under the Act, a plaintiff must allege that (1) the plaintiff was an employee of the defendant; (2) the plaintiff refused to participate in or remain silent about illegal activity; (3) the defendant employer terminated the plaintiff's employment; and (4) the sole reason for termination was plaintiff's refusal to participate in or remain silent about the illegal activity. *Davis v. Vanderbilt Univ. Med. Ctr.*, No. M2019-01860-COA-R3-CV, 2020 WL 4516094, at *3 (Tenn. Ct. App. Aug. 5, 2020), *perm. app. denied* (Tenn. Nov. 12, 2020) (citing *Webb*, 346 S.W.3d at 437). Our Supreme Court has emphasized that this statutory cause of action "requires an employee to show that his or her refusal to remain silent was the *sole* reason for the discharge." *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 37 (Tenn. 2015) (citing *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 537 (Tenn. 2002)). The TPPA defines illegal activities as "activities that are in

-12-

violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3). At all stages of a case, the plaintiff has the burden of establishing a prima facie case of retaliatory discharge. *Id*. § 50-1-304(f).

*** 

To state a claim for common law retaliatory discharge, a plaintiff must allege that (1) an employment-at-will relationship existed; (2) he was discharged; (3) the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) a substantial factor in the employer's decision to discharge him was his exercise of protected rights or his compliance with clear public policy. *Richmond v. Vanguard Healthcare Servs., LLC*, No. M2014-02461-COA-R3-CV, 2016 WL 373279, at *9 (Tenn. Ct. App. Jan. 29, 2016) (citing *Collins v. AmSouth Bank*, 241 S.W.3d 879, 884 (Tenn. Ct. App. 2007)). Notably, unlike a TPPA claim, a retaliatory discharge claim under common law requires the plaintiff to show that the alleged protected action was a substantial factor, not the sole factor leading to termination. *Id.* (citing *Williams v. City of Burns*, 465 S.W.3d 96, 111 (Tenn. 2015)).

This cause of action aims to balance "'the employment-at-will doctrine and rights granted employees under well-defined public policy.'" *Konvalinka*, 2019 WL 2323831, at *4 (citation omitted). However, this "public policy exception" to the employment-at-will doctrine "must be narrowly construed to prevent it from 'consum[ing] or eliminat[ing] the general rule.'" *Id*. (quoting *Chism v. Mid-S. Milling Co.*, 762 S.W.2d 552, 556 (Tenn. 1988)). Thus, a common law retaliatory discharge claim is available only "'in limited circumstances, [where] certain well-defined, unambiguous principles of public policy confer upon employees implicit rights which must not be circumscribed or chilled by the potential of termination.'" *Quinn-Glover v. Reg'l Med. Ctr. at Memphis*, No. W2011-00100-COA-R3-CV, 2012 WL 120209, at *6 (Tenn. Ct. App. Jan. 17, 2012) (internal quotation marks omitted) (citing *Franklin v. Swift Transp. Co., Inc.*, 210 S.W.3d 521, 530-31 (Tenn. Ct. App. 2006) (citation omitted)).

*Parker v. ABC Technologies, Inc.*, No. M2020-00675-COA-R3-CV, 2021 WL 694912, at *4-5 (Tenn. Ct. App. Feb. 23, 2021), *no appl. perm. appeal filed*.[2]  To prevail on a TPPA claim, a plaintiff must prove each element of the claim by a preponderance of the evidence. *Coffey v. City of Oak Ridge*, No. E2013-02200-COA-R3-CV, 2014 WL 4536364, at *3 (Tenn. Ct. App. Sept. 12, 2014), *Rule 11 perm. app. denied Jan. 16, 2015*.[3]  An employee may not prevail under the TPPA simply by characterizing the employer's actions as "wrong" nor by citing "public policy" in a conclusory fashion. *Sanders v. Henry Cnty.*, No. W2008-01832-COA-R3-CV, 2009 WL 1065916, at *8 (Tenn. Ct. App. April 21, 2009), *Rule 11 perm. app. denied Oct. 19, 2009*.  Rather, an employee's burden as to element (2) of a TPPA claim has been described as "formidable." *Id*.

In support of her contention that sharing her WAWF password with Goldenberg would have been an "illegal activity" under the TPPA, King cites, alongside the User Agreement, the Tennessee Personal and Commercial Computer Act and the federal Computer Fraud and Abuse Act for the proposition that "unauthorized access" to a governmental computer system is unlawful.  Under the Tennessee statute cited by King, "[w]hoever intentionally and without authorization, directly or indirectly: (1) Accesses any computer, computer system, or computer network commits a Class C misdemeanor…."  Tenn. Code Ann. § 39-14-602(b)(1) (2018).  Under the federal statute cited by King, it is unlawful to "intentionally access[] a computer without authorization or exceed[] authorized access, and thereby obtain[] … (B) information from any department or agency of the United States; or (C) information from any protected computer;…"  18 U.S.C. § 1030(a)(2).  As relevant, a "protected computer" is one used in or affecting interstate or foreign commerce or communication.  18 U.S.C. § 1030(e)(2)(B).  King brought these statutes to the Trial Court's attention, as well.

Our inquiry, however, is not whether it would have been conclusively illegal for King to have shared her WAWF password with Goldenberg for purposes of the TPPA.  As this Court has explained, it is sufficient for the employee to have reasonably believed that the activity in question was illegal:

> The trial court incorrectly concluded that the law requires that a
> plaintiff show an instruction from his or her employer to participate in illegal

---

[2] We observe that effective July 1, 2014, the TPPA was amended to "abrogate[ ] and supersede[ ] the common law with respect to any claim that could have been brought under this section." *See Williams v. City of Burns*, 465 S.W.3d 96, 110 n.11 (Tenn. 2015); Tenn. Code Ann. § 50-1-304(g).  The amendment applies to actions accruing on or after July 1, 2014. *See* 2014 Tennessee Laws Pub. Ch. 995 (S.B. 2126).

[3] Although not raised as an issue, we note that the Trial Court found King had proven her claims by clear and convincing evidence.  While clear and convincing evidence is the applicable standard for an award of punitive damages as we will discuss further herein, based on our research it does not appear to be the applicable standard for common law retaliatory discharge or claims brought under the TPPA.

-14-

activities. There is no such requirement in the law. *Mason v. Seaton*, 942 S.W.2d at 475-76. Furthermore, the plaintiffs do not have the burden of proving that the actions they complained of were conclusively illegal. Rather, it is sufficient if they had reasonable cause to believe that illegal conduct had occurred or would occur and reported it in good faith. *See id*. at 472. ("The statute's protection extends to employees who have reasonable cause to believe a law, regulation, or rule has been violated or will be violated, and in good faith report it.")

*Sykes v. Chattanooga Housing Authority*, No. E2008-00525-COA-R3-CV, 2009 WL 2365705, at *13 (Tenn. Ct. App. July 31, 2009) *aff'd* 343 S.W.3d 18 (Tenn. 2011). Nevertheless, under the TPPA, "[a plaintiff] must identify the law and policy that [he or she] contends was contravened and must be able to substantiate these allegations to some degree." *Richmond v. Vanguard Healthcare Servs.*, LLC, No. M2014-02461-COA-R3-CV, 2016 WL 373279, at *7 (Tenn. Ct. App. Jan. 29, 2016) (citations and quotation marks omitted), *R. 11 perm. app. denied Nov. 16, 2016.*

For its part, Delfasco points to, among other cases, *Chua v. St. Paul Fed. Bank for Sav.*, 1996 WL 312079 (N.D. Ill. June 7, 1996) for the proposition that an employee's refusal to provide a password to her superior is not protected activity when that employee only has the password by virtue of her employment. In the *Chua* case, Chua sued the defendant bank alleging he was wrongly terminated for refusing to give his password to his superior. *Id*. at *1-2. Chua cited a "Fedline User Guide" as a basis for withholding his password, which contained a Password protection sub-section providing: "It is your responsibility to protect your password from use by others. Your password should not be shown or given to anyone else." *Id*. at *7. The District Court ruled against Chua at the summary judgment stage, stating:

> Lao Chua argues that because his refusal to divulge his security access codes was made in good faith, he is entitled to a trial on his whistleblower claims without regard to whether the FRB's security procedures were mandatory or whether they were violated. This argument fails. If Lao Chua's refusal was in good faith *and reasonable* his actions might be protected. *Cf. Alexander v. Gerhardt Enterprises, Inc.*, 40 F.3d 187, 195 (7th Cir. 1994) (in order to prevail on retaliatory discharge claim, Title VII plaintiff only need show that she reasonably believed in good faith that the practice she opposed violated Title VII; she need not show a *prima facie* case of discrimination). However, Lao Chua's actions were not reasonable. Although the Fedline User Guide and FRB callback procedure state that fedwire codes and passwords should generally be kept secret, Lao Chua did not own or control his codes and passwords independently from the bank.

Rather, Lao Chua held the codes and passwords as an agent of the bank for purposes of doing the bank's business. Accordingly, it was not reasonable for Lao Chua to withhold his security access codes from superiors authorized by the bank to use the fedwire system and in need of training on the fedwire system; Lao Chua was the only bank employee with full access to the fedwire system, and was threatening to resign. To the extent that Lao Chua did not understand his status as an agent of the bank, Lao Chua's ignorance was not reasonable. Lao Chua is not entitled to a trial on his whistleblower claims.

*Chua*, 1996 WL 312079, at *9 (emphases in original).

Having reviewed the relevant law, we consider whether King had reasonable cause to believe sharing her WAWF password with Goldenberg would have been illegal. The Trial Court specifically credited King's testimony that she consulted with a DOD administrator who instructed her to withhold her log-in information. Such an instruction coming from a government administrator to not reveal one's password to a secure government system likely would give most reasonable people second thoughts about revealing that password. As observed by the Trial Court, sharing access to a secure DOD website is a far cry from sharing one's Netflix password. To be clear, we do not condone the latter, but the difference in gravity is relevant to determining the reasonableness of King's belief. The Trial Court further found that the Defense Logistics Agency sent King the User Agreement, reiterating that failure to protect her password could result in "civil, criminal or administrative action." We think that to "protect" one's password entails, at the very least, not giving it away to unauthorized persons, even temporarily as Delfasco suggests would be appropriate provided one quickly changed the password thereafter. Although King did not cite a statute or case to Goldenberg as grounds for not revealing her WAWF password, King has since identified 18 U.S.C. § 1030(a)(2) and Tenn. Code Ann. § 39-14-602(b) as laws against unauthorized access to computers. We do not and need not hold that it would have been conclusively illegal under these statutes for King to have given Goldenberg her WAWF password. Again, our inquiry is whether King had reasonable cause to believe revealing her password would be illegal, or, specifically for purposes of her common law claim, whether a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision was violated. The statutes cited by King indeed reflect a clear and definite public policy against unauthorized access to computer systems. Situated in a defense context, this public policy is brought into sharper relief still. Clear public policy, state and federal law, the User Agreement, and the advice given by the WAWF administrator all converge to support King in her contention that her belief was reasonable and substantiated to a sufficient degree. The evidence does not preponderate against the Trial Court's factual findings, nor is there clear and convincing evidence to overturn the Trial Court's credibility determinations.

Nevertheless, Delfasco argues that King could not have had a reasonable belief that sharing her WAWF password was illegal when she repeatedly shared it with Rohr and kept it on a post-it note on her computer monitor in her office. According to Delfasco, King only conveniently discovered the potential illegality of this practice when Goldenberg asked for her password. Delfasco points to King's negative views about Goldenberg as evidenced by her testimony. However, as found by the Trial Court, King called and spoke to an administrator who told her she must not share her password. Regardless of King's prior views about Goldenberg or her past practices of sharing her password, this conversation was an intervening event after which King's beliefs changed. The Trial Court found that "King credibly states that her focal reason for not disclosing her personal information was that she consulted a DOD administrator who instructed her to withhold her log-in information." The evidence does not preponderate against this factual finding, and the Trial Court's credibility determination is entitled to deference.

We now look to the *Chua* case cited by Delfasco, which is superficially on-point. However, *Chua* ultimately is not persuasive for a number of reasons. The plaintiff's claims in *Chua* were brought under different laws than those of the present case. In addition, the District Court in *Chua* found that "there is persuasive evidence that the security procedures outlined in the Fedline User Guide were recommendations, not legally binding mandates." *Chua*, 1996 WL 312079, at *8. That is quite distinct from the evidence in the case before us, as the User Agreement can hardly be deemed a mere set of recommendations. Delfasco argues all the same that "[i]n *Chua*, as here, it was not only legal for the employee to share a password with his or her supervisor, it was unreasonable *not* to do so when it is understood that the only reason Ms. King held the password was as an agent of the employer…." (emphasis in original). This is only half-right. It is true that King obtained WAWF passwords only by virtue of her job at Delfasco. However, the government issued King, herself, a *personalized* password and username. King testified to the background check she underwent as part of the WAWF registration process. This strongly suggests that the WAWF password was not something King could freely give out but instead was personal and exclusive to her.

Goldenberg's frustration with King was, on one level, understandable. As boss and company owner, he expected his employee to follow his instructions. Nevertheless, Goldenberg demanded King do something she had reasonable cause to believe was illegal. Goldenberg could have obtained his own log-in credentials if he wanted to access WAWF, which according to the evidence he later did. As found by the Trial Court, King reasonably believed that sharing her government-issued password to a secure DOD system was illegal. The evidence does not preponderate against any of the Trial Court's findings relative to this issue. We affirm the Trial Court in its conclusion that King held a reasonable belief that sharing her password with Goldenberg would have been unlawful.

-17-

We next address whether the Trial Court erred in concluding that King's refusal to share her password was the sole basis for her termination. Delfasco argues that King was fired for multiple reasons, and thus her TPPA claim must fail. Delfasco points to the series of emails stretching from mid-October 2013 through October 23, 2013 wherein Goldenberg became more and more frustrated with King's excuses for failing to fix the problem with the invoices. However, the Trial Court found that "[t]he only credible evidence at trial was Goldenberg's emails showing that King was fired for not providing her password. There had never been any discipline of King, and her firing was contemporaneous to her refusal to deliver her log-in information." The evidence does not preponderate against these factual findings. We need not infer why King was fired when the reason she was fired was spelled out in an email contained in the record. In fact, Goldenberg teed up the option to King in a perfect binary: either give me your password, or you are fired. King declined to comply as she had reasonable cause to believe it would be illegal for her to do so. She was fired for that and no other reason shown in the record. Any other purported reason offered by Delfasco on appeal, such as that King was fired for incompetence, finds no support in the record. We affirm the Trial Court in its finding that King's refusal to share her password was the sole basis for her termination. Thus, King has successfully proven each element of her TPPA claim.

The next issue of Delfasco's that we address is whether the Trial Court erred in admitting DOD employee Witherspoon's deposition testimony. In its brief on appeal, Delfasco asserts: "Witherspoon was not qualified to give a legal opinion and the opinion she did give did not begin to establish the sort of policy protected by either the TPPA or Tennessee common law." However, Delfasco fails to pinpoint any specific prejudice it incurred as a result of Witherspoon's testimony. The Trial Court did not cite Witherspoon's testimony in its memorandum opinion. As to Witherspoon's testimony that not protecting a WAWF password may lead to criminal liability, the User Agreement says as much and speaks for itself. Respectfully, Witherspoon's testimony on this subject was more superfluous than in any way dispositive. If the Trial Court erred in allowing Witherspoon's deposition into evidence, such error was harmless considering the record as a whole as it did not "more probably than not [affect] the judgment or ... result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

The final issue of Delfasco's we address is whether the Trial Court erred in awarding King attorney's fees under the TPPA. Tenn. Code Ann. § 50-1-304 (c)(2) (2014) provides: "Any employee terminated in violation of subsection (b) solely for refusing to participate in, or for refusing to remain silent about, illegal activities who prevails in a cause of action against an employer for retaliatory discharge for the actions shall be entitled to recover reasonable attorney fees and costs." On this issue, Delfasco's sole argument is that King failed to prove her TPPA claim, and, therefore, she may not rely on the statute for an award of attorney's fees. King has successfully proven each element of her TPPA claim, and we

have affirmed the Trial Court on that claim. Therefore, the Trial Court did not err in awarding King her attorney's fees pursuant to Tenn. Code Ann. § 50-1-304 (c)(2).

Moving now to King's issues, we address whether the Trial Court erred in declining to award King any damages for emotional distress. King asserts that the Trial Court concluded she suffered an injury, but that there was no remedy to be had. King states further that the Trial Court, misled by a brief filed by Delfasco, wrongly applied a heightened standard for recovery of damages applicable to claims of negligent infliction of emotional distress and intentional infliction of emotional distress.

It is instructive to review what the Trial Court actually found on this issue. The Trial Court found that King was distraught over losing her job and cried non-stop for two days; that King saw her treating physician once and was prescribed medicine; and that King took this medicine for a short period of time and did not require long-term treatment. The Trial Court concluded that "King's mental distress was appropriate due to her employment status, but her stress did not rise to the level or duration deserving of monetary damages." In other words, the Trial Court did not categorically rule out a remedy for emotional distress suffered by King; it simply found as a factual matter that King failed to prove a compensable injury for emotional distress. The evidence does not preponderate against the Trial Court's factual findings relative to this issue. We affirm the Trial Court in its declining King's request for emotional distress damages.

We next address whether the Trial Court erred in declining to award King punitive damages. "[B]ecause punitive damages are to be awarded only in the most egregious of cases, a plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence.[4]" *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992) (footnote in original but renumbered). *Hodges* defines these types of conduct thusly, as pertinent:

> A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. *Cf.* T.C.A. § 39-11-302(a) (1991) (criminal definition of "intentional").… A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances. *Cf.* T.C.A. § 39-11-302(c) (1991) (criminal definition of "reckless").

---

[4] Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*Id*. King asserts that three types of conduct, each justifying an award of punitive damages, were proven here: (1) Goldenberg acted intentionally in firing King as found by the Trial Court, by the standard of clear and convincing evidence, (2) Goldenberg acted maliciously by firing King in a brutal and insulting manner, and (3) Goldenberg was reckless by not showing any concern for what the law required by unlawfully firing King.

According to King, the Trial Court wrongly relied on a nebulous concept of egregiousness in denying her an award of punitive damages when egregious conduct is simply conduct which is shown to be intentional, fraudulent, malicious or reckless as proven by clear and convincing evidence. King cites *Holland v. Sullivan*, No. M2016-00538-COA-R3-CV, 2017 WL 3917142, at *11 (Tenn. Ct. App. Sept. 7, 2017), *no appl. perm. appeal filed*, in which the Sullivans were found to have made the intentional decision "to deprive Mr. Holland of his security interest in the vehicles after Mr. Holland attempted to possess the BMW. They accomplished their goal by obtaining duplicate titles based on the false representations that the titles were lost and then by using the duplicate titles to sell the BMW." This Court rejected an argument by the Sullivans that theirs was not one of "the most egregious" of cases as contemplated by *Hodges*. *Id*. at *12. This Court found instead that clear and convincing proof of intentional conduct was sufficient to warrant punitive damages. *Id*. This Court stated: "Mr. Holland proved by the clear and convincing standard that the Sullivans acted intentionally and by unlawful means to deprive him of his property interest in the BMW. Thus, as the trial court correctly found, Mr. Holland satisfied the requirements for an award of punitive damages." *Id*. In King's interpretation of *Hodges* and progeny, there is no separate analysis for egregiousness.

We disagree with King insofar as she completely subsumes consideration of what constitutes 'the most egregious of cases' into a determination of whether the conduct at issue was intentional, fraudulent, malicious or reckless. The Tennessee Supreme Court in *Hodges* stated clearly that "punitive damages are to be awarded <u>only in the most egregious of cases</u>…." 833 S.W.2d at 901 (emphasis added); *see also Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 849 (Tenn. 2010) ("a reasonable jury could not find by clear and convincing evidence that the Waughs' conduct was intentional, fraudulent, malicious, or reckless to such an extent as to justify punitive damages, <u>nor could it possibly be found to involve the most egregious of wrongs</u>") (emphasis added). Failure to consider whether a case is among the most egregious of cases when deciding whether punitive damages are warranted would be to ignore *Hodges*. We are not at liberty to do so.

In a case of rather different factual and procedural circumstances, this Court nevertheless discussed how not every instance of conduct corresponding to a *Hodges* category will give rise to an award of punitive damages:

In the case before us, the trial court allowed the jury to consider Buyers' claims of fraud and deceit, abuse of process, and conversion, and later approved the jury's verdicts against the Sellers on those claims. This approval included, at the least, an implicit finding the Buyers had shown by a preponderance of the evidence that Sellers had acted intentionally and/or fraudulently. Buyers assert that the same conduct by the Sellers that the jury and judge found sufficient to subject them to liability for compensatory damages was also sufficient to withstand a motion for directed verdict on punitive damages.

There is certainly some logic in Buyers' argument. However, their argument would necessitate a conclusion that in every action for fraud or misrepresentation, or in every action based on an intentional tort, or in every case where the underlying cause of action requires a showing of fraudulent, intentional, malicious, or reckless conduct, a directed verdict for defendants on punitive damages is never appropriate where liability for compensatory damages is allowed to go to the jury. That is simply not the law. There are a number of cases where compensatory damages for fraudulent conduct have been awarded and upheld and punitive damages denied. *See, e.g., Gage v. Seaman*, No. 03A01-9711-CH-00503, 1999 WL 95185 (Tenn. Ct. App. Feb. 23, 1999) (no Tenn. R. App. P. 11 application filed). While an award of punitive damages must be based on the same conduct warranting the award of compensatory damages, *Metcalfe v. Waters*, No. 02A01-9510-CV-00236, 1996 WL 622696 at *6 (Tenn. Ct. App. Oct. 29, 1996) (reversed in part on other grounds, 970 S.W.2d 448), the converse is not true. <u>Fraudulent, intentional, malicious, or reckless conduct which warrants an award of compensatory damages does not necessarily qualify for an award of punitive damages.</u>

*Jarmakowicz v. Suddarth*, No. M1998-00920-COA-R3-CV, 2001 WL 196982, at *12-13 (Tenn. Ct. App. Feb. 28, 2001), *no appl. perm. appeal filed* (emphasis added).

First, we fail to see how Goldenberg's firing of King via email could be construed as "reckless" for purposes of awarding punitive damages unless every unlawful termination is to be counted as reckless. Likewise, Goldenberg's rudeness toward King in their email exchange in no sense arises to malicious conduct so as to warrant punitive damages. Lastly, King alleges Goldenberg acted intentionally. To be sure, Goldenberg *intended* to bring about King's termination when he fired her; it could scarcely have been otherwise. However, we find that is distinct from the sort of intentional conduct that could give rise to punitive damages in connection with retaliatory discharge. Otherwise, every employee who prevails in a retaliatory discharge case would be entitled to an award of punitive

damages regardless of the facts of a particular case.  That is not the law.  With all due respect to King, there simply is nothing about this case that makes it a candidate for one of 'the most egregious of cases,' and certainly not by the applicable standard of clear and convincing evidence.  We, therefore, affirm the Trial Court in its declining to award King punitive damages.

The final issue we address is whether King is entitled to an award of attorney's fees incurred on appeal.  As King prevailed on her TPPA claim, she is entitled to an award of her attorney's fees incurred on appeal.  On remand, the Trial Court is to determine and enter an award of reasonable attorney's fees to King pursuant to Tenn. Code Ann. § 50-1-304(c)(2).  We affirm the judgment of the Trial Court in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below and further proceedings consistent with this Opinion.  The costs on appeal are assessed against the Appellants, Delfasco, LLC and Delfasco Finance, LLC, and their surety, if any.

 s/ D. Michael Swiney_____
D. MICHAEL SWINEY, CHIEF JUDGE

-22-